# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

**Maureen M. McDermott,**                         Civ. No. 11-2409 (PJS/AJB)

        Plaintiff,

**REPORT AND RECOMMENDATION**

**v.**

**Michael J. Astrue,**
**Commissioner of Social Security**,

        Defendant.

_____

Neut L. Strandemo, Esq., 320 Eagondale Office Center, 1380 Corporate Center Curve, Eagan, MN 55121, for Plaintiff.

David W. Fuller, Asst. United States Attorney, 600 United States Courthouse, 300 South 4th Street, Minneapolis, MN 55415, for the Commissioner.
_____


ARTHUR J. BOYLAN, United States Chief Magistrate Judge

      The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  This Court has jurisdiction under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 10] be denied and Defendant's motion for summary judgment [Docket No. 15] be granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Procedural History

Plaintiff filed an application for disability insurance benefits ("DIB") on December 15, 2008, alleging disability beginning September 1, 2007, based on ADHD; depression, bipolar type; migraine headaches; social anxiety; and right thigh injury. (Tr. 122-28, 186.)[1] Her application was denied initially and upon reconsideration. (Tr. 61-65, 68-70.) Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on May 19, 2010, before Administrative Law ("ALJ") George Gaffaney. (Tr. 172-73, 30-56.) The ALJ issued an unfavorable decision on June 29, 2010. (Tr. 11-29.) On June 22, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.) *See* 20 C.F.R. § 404.981. On August 22, 2011, Plaintiff sought review from this Court. The parties thereafter filed cross-motions for summary judgment.

### B.     Factual Background

#### 1.     Medical Records Before Alleged Disability Onset Date

The medical records begin with Plaintiff's visit to licensed social worker Richard Close at Nystrom & Associates on September 13, 2006. (Tr. 305.) Plaintiff was mildly depressed after being refused a pay upgrade, and adjusting to the possibility of leaving her job. (*Id.*) Two days later, Plaintiff saw Dr. Thomas Niebeling at Quello Clinic for back and hip pain that she had for many years, which had been treated with narcotics in the past. (Tr. 359.) On examination, Plaintiff had good range of motion of the cervical lumber spine,

---

[1] The Court will cite the Administrative Record in this matter, Docket No. 5, as "Tr."

2

mild paraspinal tenderness, mild lumber pain, and her hip examination was benign.  (*Id.*) X-rays showed minimal to no arthritis, and Dr. Niebeling opined Plaintiff's pain was muscular.  (*Id.*)

Plaintiff saw Dr. Heather Krueger at Quello Clinic on December 14, 2006, with complaints of being very achy.  (Tr. 355.)  Plaintiff worked for a school district and did a lot of walking but was able to sit for a couple hours.  (*Id.*)  Examination of Plaintiff's back was normal with the exception of tenderness over the lumbar paraspinous muscles.  (*Id.*)  Dr. Krueger recommended treatment with stretching and Tylenol.  (*Id.*)   At the end of December, Plaintiff was agitated, angry and depressed after receiving a reprimand at work. (Tr. 300.)

Plaintiff saw Dr. Niebeling for neck pain on January 15, 2007.  (Tr. 354.)  She exhibited mild tenderness to palpation of her neck, and pain with flexion and extension. (*Id.*)  Dr. Niebeling recommended physical therapy, which had been helpful for Plaintiff's neck pain in 2004.  (*Id.*)  That same day, Plaintiff told her therapist she was looking for a new job.  (Tr. 299.)  Plaintiff's affect was normal and her mood was anxious.  (*Id.*)

Plaintiff was evaluated for physical therapy at Institute for Athletic Medicine on January 17, 2007.  (Tr. 311-12.)  Plaintiff reported having neck and mid-thoracic pain off and on for three years, now constant but of varying intensity.  (Tr. 311.)  Computer work aggravated her pain and exercises relieved it.  (*Id.*)

On February 9, 2007, Plaintiff told Richard Close that she might be moved to full-time work in a higher pay grade.  (Tr. 297.)  For the next eight therapy sessions, Plaintiff's mood and affect were normal.  (Tr. 296, 295, 294, 293, 292, 291, 290, 289.)  In June 2007, Plaintiff obtained a new job.  (Tr. 290.)  Close noted Plaintiff was on two medications for

migraines, and questioned whether her headaches had been work-related. (*Id.*) When Plaintiff started her new job, her mood and energy improved. (Tr. 289.)

## 2. Medical Records After Alleged Disability Onset Date

Plaintiff was referred to psychiatrist Ruth Myers at Park Nicollet Clinic, after Plaintiff's former psychiatrist was deployed to Iraq. (Tr. 446-49.)  On October 9, 2007, Dr. Myers noted Plaintiff worked at Eden Prairie schools for several years, performing many tasks above her pay grade, and the stress of the job created severe recurrent migraine headaches. (Tr. 446.)  Plaintiff left her job and was hired as an administrative assistant for a company that coordinated festivals. (*Id.*)  The job was temporary and ended after 75 days. (*Id.*)  Plaintiff then spent a month in bed due to stress and other unresolved issues. (*Id.*)  She had only recently gotten out of bed to look for work and become more active. (*Id.*)  She wanted to go back to a management position but did not have a college degree. (*Id.*)  Plaintiff had started therapy with social worker Richard Close three years prior in connection with her bariatric surgery, but continued to address other issues because she found it extremely helpful. (*Id.*)  Plaintiff's medications included Zoloft, Wellbutrin, B12 injections and Synthroid. (*Id.*)

Plaintiff's mental health problems were social anxiety disorder and depression linked to occupational stress. (*Id.*)  She had very low energy and significant depressed mood. (Tr. 447.)  Plaintiff had not had a migraine headache since quitting her job in the school district. (*Id.*)  She lived with her mother, and they got along fine. (*Id.*)

On mental status examination, Plaintiff indirectly responsed to questions and frequently related in a "very youthful manner." (Tr. 448.)  Her thoughts and associations were intact. (*Id.*)  Plaintiff said she had a spiritual gift of seeing departing spirits, but there

4

was no evidence of hallucinations, delusions or psychosis. (*Id.*) Plaintiff felt she was depressed for several months, maybe longer, with only one panic attack and no manic symptoms. (*Id.*) Formal mental status examination and memory were normal. (*Id.*) Dr. Myers diagnosed severe depression and social anxiety disorder, with a GAF score of 50.[2] (*Id.*)

When Plaintiff next saw Dr. Myers on November 9, 2007, she was happy about regaining the internal voice that helped her through her day. (Tr. 444.) This "voice" was just really her imagination, not a psychotic hallucination, and it had disappeared when she was very depressed. (*Id.*) Plaintiff reported that two or three times a year she had periods of sleeping less, with good feelings and energy, but not out of control. (*Id.*) Plaintiff also reported pain throughout her body, related to injuries when she was young. (*Id.*) She intended to go back to physical therapy. (*Id.*) Plaintiff's depression had improved, and Dr. Myers assessed a GAF score of 80. (Tr. 445.)

Three weeks later, Plaintiff was pleased with her improvement after switching from Wellbutrin to Zoloft, but she was not sleeping well, and her anxiety increased in social situations. (Tr. 442.) Plaintiff had just attended two job interviews, and she was upbeat,

---

[2] The Global Assessment of Functioning ("GAF") scale is a rating of overall functioning on a scale of 0 to 100, taking into account psychological, social and occupational functioning. Diagnostic and Statistical Manual of Mental Disorder 34 (American Psychological Association 4th ed. text revision 2000) ("DSM-IV-TR"). Scores of 31-40 indicates some impairment in reality testing or communications or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood. *Id.* Scores of 41-50 indicate serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* Scores of 51-60 indicate moderate symptoms or any moderate difficulty in social, occupational or school functioning. *Id.* Scores of 61-70 indicate some mild symptoms or some difficulty in social, occupation or school functioning but generally functioning pretty well. *Id.* Scores of 71-80 indicate that if symptoms are present, they are transient and expectable reactions to psychosocial stressors. *Id.*

but also somewhat expansive and "slightly loose" in her presentation.  (*Id.*)  Dr. Myers assessed a GAF score of 80, and started to taper Plaintiff off Zoloft in order to start Cymbalta.  (Tr. 443.)  Dr. Myers noted Plaintiff's migraine headaches were in remission. (Tr. 442.)

On December 14, 2007, Plaintiff was feeling well and sleeping well.  (Tr. 438.)  Dr. Myers assessed a GAF score of 80.  (Tr. 439.)  Several weeks later, Plaintiff was planning on doing some temporary work, filling in for her mother while her mother was out of work after knee surgery.  (Tr. 440.)  Plaintiff appeared brighter.  (*Id.*)  She did not have any impulse to stay in bed.  (*Id.*)  Dr. Myers stated, "[s]he quit cigarettes and she knows the main issue right now that interferes with her sleep and overall health is that she is not on any sort of exercise program."  (*Id.*)  Dr. Myers diagnosed major depression, rule out bipolar type II, social anxiety disorder, with a GAF score of 80.  (Tr. 441.)

Plaintiff was looking for work, her mood was very good, and she had started physical therapy when she saw Dr. Myers at the end of January 2008.  (Tr. 436.)  Dr. Myers reduced Plaintiff's Cymbalta in hopes of helping her sleep, and she assessed Plaintiff with a GAF score of 80.  (Tr. 437.)  A few weeks later, Plaintiff's mood was very upbeat, but her speech was somewhat pressured, which Plaintiff said was normal for her.  (Tr. 434.)  She was caring for her mother after her mother's surgery, and also applying for jobs.  (*Id.*)  Plaintiff was not having symptoms of social phobia.  (*Id.*)  Dr. Myers assessed a GAF score of 80. (Tr. 435.)

Plaintiff saw Dr. Niebeling on February 19, 2008, after calling and requesting Percocet for bilateral leg pain.  (Tr. 350.)  Examination showed 1-2+ edema in her legs, and Dr. Niebeling prescribed Percocet and a diuretic.  (*Id.*)  Plaintiff returned with continuing leg

6

pain on March 3, 2008.  (Tr. 349.)  Dr. Niebeling noted Plaintiff remained obese after having gastric bypass surgery.  (*Id.*)  Dr. Niebeling increased Plaintiff's dose of Lasix.  (*Id.*)

Ten days later, Plaintiff told Dr. Niebeling her entire body ached.  (Tr. 348.)  Dr. Niebeling noted that Plaintiff had chronic leg pain, for which she took Midrin and Vicodon. (*Id.*)  On neurological examination, Plaintiff was very tender in most of her muscles, which was possibly related to her recent viral syndrome.  (*Id.*)  On March 26, 2008, Dr. Niebeling noted the Lasix had helped Plaintiff's leg pain, but Plaintiff complained of bone pain and edema.  (Tr. 348.)

Around this time, Plaintiff saw Dr. Myers and reported feeling poorly and being stressed by applying for bankruptcy.  (Tr. 428.)  She continued to look for a job and apply for assistance.  (*Id.*)  She had a recurrence of migraines and Imitrex was not helping.  (*Id.*)  Plaintiff was planning on attending a job fair, but she was particular about what sort of job she would accept.  (*Id.*)  Dr. Myers assessed a GAF score of 80, and increased Plaintiff's Cymbalta.  (Tr. 428-29.)

Plaintiff was evaluated for physical therapy to treat chronic neck pain and headaches on April 8, 2008.  (Tr. 313-15.)  Plaintiff reported yearly flare ups of pain but good control with physical therapy.  (Tr. 313.)  Plaintiff's examination was consistent with degenerative cervical dysfunction.  (Tr. 314.)

A few days later, Plaintiff reported her mood was good on Cymbalta, but her life was not going well, with unemployment and friction with her mother.  (Tr. 432.)  Plaintiff complained of poor sleep and aches and pains varying with the weather.  (*Id.*)  She was clear, alert, focused, with euthymic mood and only slightly pressured speech.  (*Id.*)  Dr.

Myers diagnosed bipolar disorder type 2, and social phobia in remission. (*Id.*) She assessed Plaintiff with a GAF score of 50. (Tr. 433.)

Plaintiff was less depressed on April 24, 2008, but she felt little motivation, and really did not feel like leaving her room. (Tr. 430.) In addition to her own frustrating unemployment, Plaintiff's mother's job would be coming to an end soon. (*Id.*) Dr. Myers opined Plaintiff's social phobia was slightly worse, and she assessed a GAF score of 50. (*Id.*) She also noted Plaintiff's migraines to be in remission. (*Id.*) Dr. Myers started Plaintiff on Wellbutrin. (Tr. 431.)

On May 6, 2008, Plaintiff reported to Dr. Myers that she felt much better, and was sleeping eight hours at night. (Tr. 418.) Dr. Myers diagnosed depression, bipolar type; and assessed a GAF score of 70. (*Id.*) When Plaintiff saw Dr. Niebeling a week later, she reported having been severely depressed, not getting out of bed, using food to self-medicate, and gaining weight. (Tr. 347.) Plaintiff continued to have edema in both legs and was severely vitamin D deficient but denied headaches. (*Id.*) Dr. Niebeling ordered lab tests. (*Id.*) Several weeks later, Plaintiff saw Dr. Niebeling for left knee pain, after having a negative x-ray. (Tr. 346.) Dr. Niebeling opined Plaintiff's examination was consistent with patellofemoral syndrome, and he prescribed physical therapy, anti-inflammatories, and ice. (*Id.*)

Plaintiff saw Dr. Myers on June 10, 2008, and reported her medications were okay but she was under severe financial stress. (Tr. 426.) Plaintiff was tearful, and said she was almost at the point of applying for jobs she did not want, but was more likely to be offered. (*Id.*) Plaintiff said she believed herself to be a weekend alcoholic because she liked to have several drinks on the weekend, but it never caused her any problems. (*Id.*)

Dr. Myers assessed a GAF score of 60.  (Tr. 427.)

On June 24, 2008, Plaintiff reported having increased migraines over the last few months, probably due to the stress of being unable to find a job.  (Tr. 345.)  Plaintiff was using Midrin and Vicodin for her headaches, and Dr. Niebeling refilled her medications.  (*Id.*) He also recommended exercise, diet and other preventative measures.  (*Id.*)  Plaintiff also reported her increased headaches to Dr. Myers on July 2, 2008.  (Tr. 424.)  Plaintiff was alert and oriented with labile mood and moderate anxiety.  (*Id.*)  Dr. Myers diagnosed depression, bipolar type; and assessed a GAF score of 50.  (*Id.*)  She increased Plaintiff's Topamax.  (Tr. 424-25.)

On July 21, 2008, Plaintiff was happy with the effects of Topamax and Wellbutrin, feeling her mood was stabilized, but she felt certain Wellbutrin was giving her migraines. (Tr. 422.)  Plaintiff's focus and concentration were excellent.  (*Id.*)  Dr. Myers prescribed Adderall in place of Wellbutrin, and assessed Plaintiff with a GAF score of 60.  (*Id.*)

Plaintiff's mood and concentration continued under good control on August 4, 2008. (Tr. 420.)  Her sleep and appetite were normal.  (*Id.*)  Three weeks later, her mood remained stable, and her concentration was very good.  (Tr. 419.)  Plaintiff was frustrated about not getting a job offer after many interviews.  (*Id.*)  Her anxiety was minimal, and her focus was better.  (*Id.*)  Dr. Myers assessed a GAF score of 80.  (*Id.*)

When Plaintiff saw Dr. Myers on September 4, 2008, she had symptoms of anxiety and mood swings, with problems focusing her attention.  (Tr. 415.)  Plaintiff was taking Adderall, and although her mood and concentration were good, she felt restless and anxious, and her sleep was interrupted.  (*Id.*)  Dr. Myers assessed a GAF score of 70, and discontinued Plaintiff's Adderall.  (*Id.*)  The next month, Plaintiff told Dr. Myers that she was

9

doing very well at a new job, and was getting along with her mother.  (Tr. 414.)  Dr. Myers assessed a GAF score of 80.  (*Id.*)

On October 29, 2008, Plaintiff's therapist, Richard Close, wrote to Plaintiff's employer and asked that her work schedule be adjusted to 7:00a.m. to 2:30p.m. for medical reasons "related to her physical and mental health." (Tr. 389.)  The record contains an employment termination letter from TLC Special Transportation to Plaintiff, dated November 3, 2008. (Tr. 387-88.)  Plaintiff was let go from her job as a driver due to excessive work absences and a complaint from a client about Plaintiff inappropriately sharing her personal history.  (*Id.*) Plaintiff was found eligible for unemployment.  (Tr. 390.)

Two weeks later, Dr. Myers opined Plaintiff's mood was relatively stable, despite her stress.  (Tr. 410.)  She assessed Plaintiff with a GAF score of 60.  (*Id.*)  On November 25, 2008, Plaintiff was very upset about being denied public assistance.  (Tr. 412.)  Her mood was otherwise euthymic.  (*Id.*)  Dr. Myers increased Plaintiff's Cymbalta, and assessed a GAF score of 60.  (*Id.*)

Plaintiff returned to Dr. Niebeling on November 20, 2008, for evaluation of body pain. (Tr. 343.)  The pain was worse in her low back and legs.  (*Id.*)  Examination revealed mild tenderness in the back.  (*Id.*)  Plaintiff denied headaches.  (*Id.*)  Dr. Niebeling recommended ice therapy and anti-inflammatories.  (*Id.*)  The next month, December 22, 2008, Plaintiff complained of tingling in her fingers, toe pain, and muscle and jaw pain.  (Tr. 342.)  She continued to deny headaches.  (*Id.*)  Dr. Niebeling ordered lab tests.  (*Id.*)

Plaintiff saw Dr. Myers on December 12, 2008, and reported that she won her claim for unemployment benefits, but she and her mother were being evicted.  (Tr. 406.)  Plaintiff was sad and frustrated about being denied other public benefits.  (*Id.*)  On examination,

Plaintiff was using a cane, and she was alert and oriented.  (*Id.*)  She reported missing doses of her medication from time to time due to disorganization and stress.  (*Id.*)  Plaintiff's mood was euthymic but also irritable and somewhat abrasive.  (*Id.*)  Dr. Myers diagnosed depression, bipolar type; ADHD; and assessed a GAF score of 60.  (*Id.*)

When Plaintiff followed up with Dr. Myers on January 9, 2009, she had not taken any mental health medication for a month.  (Tr. 408.)  Her moods were cycling fairly rapidly; she was feeling more alert and creative, getting little sleep, and starting numerous projects without finishing them.  (*Id.*)  She was having trouble sustaining attention, but she thought it would be pleasant to remain in a hypomanic phase, yet she recognized she needed medication before she "crashed."  (*Id.*)  Socially, Plaintiff was experiencing a lot of contention with her mother and with people she met in the course of enrolling in school.  (*Id.*)  Plaintiff was excited about enrolling in college to earn her bachelor's degree in alternative medicine.  (*Id.*)  On examination, Plaintiff was alert and oriented, but exhibited pressured speech, slight loosening of associations; and she was scattered, irritable, and in a hypomanic mood.  (*Id.*)  Dr. Myers diagnosed bipolar disorder and ADHD, and assessed a GAF score of 40.  (*Id.*)  She lowered Plaintiff's doses of Topamax, Cymbalta and Strattera. (Tr. 409.)

When Plaintiff saw Dr. Myers on February 26, 2009, her extreme mood swings were in remission, but she experienced prolonged, unprovoked episodes of crying.  (Tr. 402.)  Plaintiff's appetite was okay, but her sleep was disrupted.  (*Id.*)  She was getting along well with her family and godchildren.  (*Id.*)  Plaintiff endorsed smoking and drinking one to two drinks every night.  (*Id.*)  She was trying to get disability benefits, and her next goal would be to focus on her health and be more physically active.  (*Id.*)

11

On examination, Plaintiff was alert and oriented, with euthymic mood, intact cognition, but elevated anxiety level. (*Id.*) Stopping the medication Stattera had recently eliminated Plaintiff's headaches. (*Id.*) Dr. Myers diagnosed ADHD and bipolar disorder, and assessed a GAF score of 50. (Tr. 402-03.) She increased Plaintiff's Lamictal to help with her sleep pattern and crying spells. (Tr. 403.)

A month later, Plaintiff was stressed about school. (Tr. 521.) She was sleeping poorly, but despite her stress, she said her mood was remarkably improved. (*Id.*) Plaintiff was happy that she had finished some knitting projects, something she had been unable to do in the past. (*Id.*) Plaintiff's mood was euthymic and her cognition intact, although her anxiety was elevated. (*Id.*) Dr. Myers noted Plaintiff's migraines were in remission. (*Id.*) She assessed Plaintiff with a GAF score of 60. (Tr. 522.)

On April 8, 2009, Plaintiff's therapist, Richard Close, wrote a "To Whom It May Concern" letter, stating a significant part of Plaintiff's mental health was affected by ongoing migraine headaches, a contributing factor in her inability to work. (Tr. 507.) Plaintiff received both mental health and medical treatment for her headaches. (*Id.*)

On April 19, 2009, Dr. K. Neville reviewed Plaintiff's social security file and completed a Psychiatric Review Technique form at the request of the SSA. (Tr. 453-66.) Dr. Neville opined Plaintiff had an organic mental disorder and an affective disorder, which resulted in mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence or pace, with no episodes of decompensation. (*Id.*) Dr. Neville also completed a Mental Residual Functional Capacity Assessment of Plaintiff, opining that Plaintiff retained the capacity for work-type social interactions; Plaintiff's attention and concentration were somewhat limited, and she would

need minimal redirection to finish tasks; Plaintiff's pace could be decreased slightly by depression; Plaintiff had limited frustration tolerance but appeared capable of minimal contact with the general public in a work setting; and Plaintiff retained the capacity to function in a competitive setting.  (Tr. 468-71.)  Dr. Ray Conroe reviewed Plaintiff's file and affirmed Dr. Neville's opinion on September 9, 2009.  (Tr. 541-43.)

When Plaintiff saw Dr. Myers on April 29, 2009, school was going generally well for her, and her headaches were markedly improved.  (Tr. 519.)  Plaintiff found herself to be less reactive and enraged, even when significantly provoked.  (*Id.*)  She felt better that she was able to do all of her household chores.  (*Id.*)  She was sleeping relatively well, but was achy in rainy weather.  (*Id.*)  Dr. Myers assessed a GAF score of 60.  (*Id.*)

On May 15, 2009, Dr. William Paule reviewed Plaintiff's social security file at the request of the SSA, and opined that Plaintiff did not have a severe physical problem.  (Tr. 475-77.)  Dr. Charles Grant affirmed Dr. Paule's determination on September 9, 2009.  (Tr. 546.)  The next week, Close wrote a letter to the SSA supporting Plaintiff's disability claim. (Tr. 505.)  Close stated that he treated Plaintiff for severe depression, and her depressive symptoms impaired her ability to think and to get along with people on a sustained basis. (*Id.*)  He opined that Plaintiff lost her last two jobs due to her mental health symptoms.  (*Id.*) Close completed a mental health update of Plaintiff on June 11, 2009, and opined Plaintiff was "not able to work at this time in her field."  (Tr. 506.)

Plaintiff's mood was stable and school was going well for her when she saw Dr. Myers on May 27, 2009.  (Tr. 517.)  Dr. Myers diagnosed cyclothymic disorder[3] and ADHD,

---

[3] The essential feature of cyclothymic disorder (DSM-IV-TR Code 301.13) is fluctuating mood disturbance involving numerous periods of hypomanic symptoms and numerous

improved migraines, and a GAF score of 60.  (*Id.*)  She started Plaintiff on Restoril because

Ambien made Plaintiff feel disoriented.  (*Id.*)

Dr. Niebeling referred Plaintiff to Dr. Monty Seper at Physicians Neck and Back Clinic

for evaluation of her neck and upper back pain.  (Tr. 499.)  Dr. Seper evaluated Plaintiff on

May 28, 2009, and Plaintiff reported neck pain for years, not improved with physical therapy

or chiropractic manipulation.  (*Id.*)  Plaintiff rated her pain as constant and at a severity level

eight out of ten, increasing with physical activity.  (*Id.*)  On examination the only abnormal

finding was hypersensitivity palpation response.  (Tr. 501.) Dr. Seper diagnosed non-specific

cervical spine pain; cervical degenerative disc changes with imaging; and severe

deconditioning syndrome, with 70% deficit compared with a normal population.  (*Id.*)  Dr.

Seper recommended a short-term active rehabilitation program.  (Tr. 501-02.)

Several weeks later, Plaintiff asked for an urgent appointment with Dr. Myers due to

financial stress and upcoming eviction.  (Tr. 515.)  Plaintiff said she was able to get out of

bed and function despite the stress.  (*Id.*)  Plaintiff was tearful, stressed and despondent.

(*Id.*)  Dr. Myers diagnosed adjustment reaction with mixed anxious and depressed features,

and assessed a GAF score of 50.  (Tr. 515-16.)  Dr. Myers also noted Plaintiff's migraines

were improved, but Plaintiff said she could not work at any jobs involving standing due to

her severe leg pain.  (Tr. 515.)

On June 24, 2009, Plaintiff was getting some economic support, which reduced her

anxiety.  (Tr. 513.)  She told Dr. Myers that she was not sleeping well.  (*Id.*)  Plaintiff was

---

periods of depressive symptoms but there are insufficient number, severity,
pervasiveness or duration to meet the criteria for manic or major depressive episodes.
DSM-IV-TR at 398.

"slightly scattered and slightly pressured in her presentation and considerably brighter and more alert." (*Id.*)  Her mood was euthymic to slightly hypomanic.  (*Id.*)  Dr. Myers assessed a GAF score of 60, and increased Plaintiff's dose of Lamictal.  (Tr. 513-14.)

The next week, Plaintiff followed up with Dr. Seper after attending seven rehabilitation sessions for her neck pain.  (Tr. 531-32.)  Subjectively, Plaintiff said her neck pain was the same, but there was objective improvement in her functioning.  (Tr. 532.)

Close met with Plaintiff on July 13, 2009, and told her he was leaving the clinic.  (Tr. 590-91.)  They discussed Plaintiff's discouragement at the lack of response to her job applications.  (Tr. 590.)  Plaintiff was considering self-employment, which Close endorsed "given her chronic difficulty with social relationships." (*Id.*)  Close referred Plaintiff to Leslie Edelstein for continued therapy.  (Tr. 591.)

On July 30, 2009, Dr. Myers noted Plaintiff's severe headaches had finally remitted. (Tr. 404.)  She had recently completed eleven sessions of rehabilitation for her neck pain, with great improvement of her neck and headache pain.  (Tr. 735-36.)  Plaintiff was currently a student studying alternative medicine, and she had severe problems with focus and attention, interfering with her school work.  (*Id.*)  Her symptoms included mood swings, sadness, irritability, sleep disturbance, racing thoughts and crying spells.  (*Id.*)  Plaintiff was also involved in a prolonged, contentious argument with her mother.  (*Id.*)  Dr. Myers noted that during the session, Plaintiff worked on a computer and talked on her cell phone.  (*Id.*) Plaintiff's mood ranged from silly, tearful to irritable and angry during the short visit.  (*Id.*) Dr. Myers assessed a GAF score of 50, and prescribed Strattera and Lamictal.  (*Id.*)

Plaintiff met with Leslie Edelstein, a licensed social worker at Park Nicollet Clinic, for a diagnostic assessment on August 4, 2009.  (Tr. 582-86.)  Plaintiff and her mother were

being evicted from their home, and hoping to get an apartment.  (Tr. 583.)  Plaintiff was only sleeping 2-4 hours at night and was constantly fatigued.  (*Id.*)  The previous night, she tried Seroquel for the first time, and was able to sleep.  (*Id.*)  Plaintiff's symptoms included increased appetite, low energy and motivation, loss of interest in activities, difficulty concentrating, frequent crying, poor self-esteem, feelings of hopelessness, social withdrawal, anxiety with muscle tension, irritability, occasional panic attacks with hot/cold flashes, and mood shifts relative to financial and legal problems.  (*Id.*)  Plaintiff's physical symptoms included headaches, dry mouth, inability to relax, vomiting, stomach problems, neck and back pain, and other chronic pain.  (*Id.*)

Edelstein reviewed Plaintiff's work history.  (Tr. 584.)  Plaintiff was a school secretary for transportation from 2003-2007, and said she loved her job but quit due to migraine headaches caused by stress.  (*Id.*)  She then worked as a customer service representative and a special needs van driver.  (*Id.*)  She applied for disability.  (*Id.*)  Plaintiff was taking one class per month, studying psychology for a BA degree in alternative medicine through Everglades University in Florida.  (*Id.*)

On mental status examination, Plaintiff's speech was rapid, and her thoughts and perceptions were scattered and difficult to follow at times.  (Tr. 585.)  Plaintiff was talkative, and at times grandiose.  (*Id.*)  Her affect varied.  (*Id.*)  Plaintiff was fully oriented, having difficulty with short-term memory but with intact remote memory.  (*Id.*)  Plaintiff reported difficulties with attention and concentration.  (*Id.*)  Edelstein diagnosed mood disorder, NOS [not otherwise specified]; anxiety disorder, NOS; ADHD NOS; and adjustment disorder with mixed anxiety and depressed mood.  (*Id.*)  She assessed Plaintiff with a GAF score between 60-70.  (*Id.*)

Plaintiff met with Edelstein again about a week later, and reported she had received general assistance and was able to secure an apartment while preparing for eviction and foreclosure.  (Tr. 579-80.)  Plaintiff's score on the PHQ-9[4] was 19, indicating moderately severe depression.  (*Id.*)  Plaintiff appeared in better spirits, and her mood was not congruent with her PHQ-9 score.  (Tr. 580.)  On August 27, 2009, Plaintiff reported increased anxiety associated with moving out of her home.  (Tr. 573.)  She was sleeping little, vomited from stress, and was ruminative and task oriented.  (*Id.*)  Edelstein diagnosed cyclothymic disorder; anxiety disorder, NOS; ADHD, NOS; adjustment disorder with mixed anxiety and depressed mood; and personality disorder, NOS, cluster B traits.[5]  (Tr. 574.)

When Edelstein saw Plaintiff on September 9, 2009, Plaintiff had not been sleeping much, she was wound up, and she was exhibiting hypomanic behaviors of rapid speech and flight of ideas.  (Tr. 570-71.)  At the next session, Plaintiff acknowledged her irritability and mood swings but had difficulty grasping the concept of grandiosity, which was evident in Plaintiff's story telling.  (Tr. 566-67.)  Edelstein noted Plaintiff was assertive but sometimes bordered on aggressive.  (*Id.*)  Plaintiff was not hypomanic at this session, and reported getting more sleep.  (Tr. 567.)  Her mood varied from tearful and upset to hyper and excited.  (*Id.*)

On September 21, 2009, Plaintiff saw Dr. Niebeling for a three-week long headache that did not respond to the medication Midrin.  (Tr. 689-90.)  Plaintiff said her mother had

---

[4] The Patient Health Questionnaire ("PHQ-9") is a depression scale, completed by self-report, with nine questions.  http://www.phqscreeners.com/pdfs/02_PHQ-9/English.pdf

[5] Cluster B personality disorders include antisocial, borderline, histrionic and narcissistic personality disorders.  DSM-IV-TR at 701-17.

responded to Fiorinal for headaches, and Dr. Niebeling prescribed it to Plaintiff.  (Tr. 689.)
At that time, Plaintiff was stressed from moving. (Tr. 563-64.)  She had started a babysitting
job for a minimal amount of money per week.  (*Id.*)  Plaintiff's mood was irritable, and she
was easily tired and easily cried.  (*Id.*)  A week or so later, Plaintiff was having difficulties
with her babysitting job because the hours were more than anticipated, and she had
concerns about the children's well being. (Tr. 559-60.)   Plaintiff's mood varied from
defensive to irritable to sad. (Tr. 561.)  In the meantime, Plaintiff reached maximum medical
improvement after fifteen sessions of physical therapy for her neck pain.  (Tr. 733-34.)
Plaintiff was advised to continue with the home program and keep her muscles strong.  (Tr.
734.)

On October 15, 2009, Plaintiff told Edelstein that she quit babysitting.  (Tr. 556-57.)
Edelstein noted some underlying agitation in Plaintiff's mood, and grandiosity and sadness
were also evident.  (*Id.*)  Edelstein diagnosed cyclothymic disorder and ADHD, combined
type.  (*Id.*)

Plaintiff continued to have headaches in October, and she had a bad reaction to
Fiorinal.  (Tr. 687-88.)  Dr. Niebeling prescribed Fioricet and an increase in Elavil.  (Tr. 687.)
On November 2, 2009, Plaintiff reported difficulties with insomnia, and Ambien was not
helping.  (Tr. 686.)  She denied significant headaches.  (*Id.*)  Dr. Niebeling prescribed
Klonopin.  (*Id.*)

In her progress note of October 29, 2009, Edelstein noted Plaintiff had engaged in
splitting behaviors between herself and Dr. Myers. (Tr. 553-54.)  Edelstein believed Plaintiff
was resisting therapeutic efforts.  (Tr. 554.)  Since the last session, Plaintiff withdrew from
one of her classes because she was not satisfied with her grade and there was too much

work.  (*Id.*)  Plaintiff had test anxiety and dyslexia.  (*Id.*)  Plaintiff's mood was more anxious than depressed, but she was not hypomanic.  (*Id.*)  Edelstein diagnosed cyclothymic disorder and ADHD, combined type.  (*Id.*)

Plaintiff was evaluated by Dr. Ingrid Abols at Minneapolis Clinic of Neurology upon referral by Dr. Niebeling for Plaintiff's complaints of falling down due to right leg weakness.  (Tr. 730-32.)  Plaintiff's falls had recently decreased to two or three times a month, and she used a cane to prevent herself from falling.  (Tr. 730.)  Her leg was not weak on a daily basis.  (*Id.*)  The only numbness in Plaintiff's leg was the site where she had muscle taken for her gastric bypass in November 2005.  (*Id.*)  Plaintiff had regained 40-50 pounds in the last year and weighed around 260 pounds.  (*Id.*)  Plaintiff reported that she was diagnosed with fibromyalgia sixteen years ago but had not seen a rheumatologist.  (Tr. 731.)  Plaintiff also thought she had restless leg syndrome.  (*Id.*)  There were no objective findings for Plaintiff's right leg complaints upon examination.  (Tr. 732.)  Dr. Abols ordered an EMG of both lower extremities, and advised Plaintiff to walk with a cane.  (*Id.*)

In therapy on November 12, 2009, Plaintiff reported recent stresses of a computer virus affecting her work in an on-line college course; and costs associated with fixing her computer, dental work, and fixing her car after an accident.  (Tr. 550-51.)  Plaintiff also discussed her family history.  (*Id.*)  Edelstein diagnosed personality disorder, NOS, narcissistic symptoms.  (*Id.*)

The next month, Plaintiff told Dr. Myers it was her worst year ever.  (Tr. 749-50.)  Plaintiff's mood was dysthymic, she was socially isolated, but her pain was under relatively good control.  (Tr. 749.)  Dr. Myers recommended that Plaintiff get involved with a church or another restorative experience.  (Tr. 750.)  In January 2010, Plaintiff's chronic migraines

were doing well on treatment with Fioricet, Midrin and Vicodin.  (Tr. 681-82.)  Dr. Niebeling

renewed Plaintiff's pain contract and prescribed Vicodin.  (Tr. 682.)

On January 6, 2010, Plaintiff was evaluated at Minneapolis Clinic of Neurology for

her right leg giving out.  (Tr. 728.)  Her EMG, EEG, TSH, ANA, rheumatoid factor and

Lyme's titer test results were normal.  (*Id.*)  Plaintiff also complained of aches and pain all

over, with a history of fibromyalgia.  (*Id.*)  Plaintiff's neck pain was improved after physical

therapy, but she reported chronic daily headaches since 2005, which were finally improving.

(*Id.*)  Dr. Abols opined the only change in Plaintiff's migraine treatment was the addition of

amitriptyline, which resulted in significant improvement in her headaches.  (*Id.*)  Plaintiff's

physical examination was normal.  (*Id.*)  Dr. Abols told Plaintiff it was inappropriate for her

to continue on Fioricet on a regular basis for her headaches, but Plaintiff was "quite attached

to her 'cocktail' and [did] not want to hear about any change in that."  (Tr. 729.)  Dr. Abols

referred Plaintiff for sleep evaluation and  treatment for apnea, if appropriate, to manage her

headaches.  (*Id.*)

When Plaintiff's former therapist, Richard Close, established his practice at

Associated Clinic of Psychology, Plaintiff began to treat with him again January 2010.  (Tr.

660-76.)  Plaintiff's medications included Midrin, Vicodin and Fioricet for migraines, Lasix

for water weight, Synthroid for hypothyroidism, lamotrigine and Strattera for depression,

Amitriptyline and clonazepam for sleep, and Ultracet for pain.  (Tr. 659.)

On January 12, 2010, Close noted that Plaintiff had seen a neurologist and no

organic cause for her migraines was found.  (Tr. 647.)  Plaintiff's energy had improved since

her last session, and she was invested in her education and seeking part-time work.  (*Id.*)

Close diagnosed dyslexia.  (*Id.*)  The next week, Plaintiff's mental status and mood were

20

stable.  (Tr. 645.)  On January 21, 2010, Plaintiff's mood and energy were improved, and she and Close discussed finding a job that would match her temperament.  (Tr. 644.)  At the next session, Plaintiff reported she cut her classes to part-time and needed additional assistance due to dyslexia.  (Tr. 643.)  Plaintiff's diagnoses included ADHD, predominantly inattentive type,[6] and reading disorder.  (*Id.*)

Plaintiff followed up regarding her sleep study at Minnesota Sleep Institute on January 25, 2010.  (Tr. 726-27.)  Dr. Kathy Gromer opined Plaintiff's use of one to three drinks of alcohol per night may be worsening her sleep disordered breathing, and recommended she discontinue alcohol beyond a glass of wine at dinner.  (Tr. 727.)  Dr. Gromer also recommended a trial use of oxygen for hypoventilation in REM sleep, which might help with Plaintiff's headaches.  (*Id.*)  In follow-up on February 10, Plaintiff reported the oxygen did not help and her headaches were worse.  (Tr. 720.)  Plaintiff did not take the recommendation to discontinue alcohol after dinnertime or to avoid drinking when taking Klonopin and amitriptyline.  (Tr. 721.)  Physician Assistant Brenda Henney repeated these recommendations.  (*Id.*)

On February 2, 2010, Plaintiff told Close her medications would be changed to address her problem with irritability.  (Tr. 641.)  Plaintiff also discussed her depression and anxiety from her father's death and loss of her home.  (*Id.*)  Close noted Plaintiff was "voicing for [the] first time her desire to change her lifestyle."  (*Id.*)  Two weeks later, Plaintiff's depression appeared to be in remission, but her affect was anxious and her

---

[6] ADHD, predominantly inattentive type, DSM-IV-TR Code 314.00, is diagnosed when six or more symptoms of inattention have persisted for six months but hyperactivity may still be a significant clinical feature.  DSM-IV-TR at 87.

irritability increased.  (Tr. 639.)  She was failing a math course and waiting for her school to provide accommodations for dyslexia.  (*Id.*)  The next day, Close confronted Plaintiff about using anger to solve her problems, after an incident between Plaintiff and staff.  (Tr. 638.)  At that time, Plaintiff was going off pain medications for her migraines but was still using Ultracet.  (*Id.*)  Later that month, Plaintiff's energy was improved, and her depression was in partial remission.  (Tr. 637.)  She was leaving her school and would seek an AA degree in healthcare administration instead.  (*Id.*)

Plaintiff followed up with Dr. Abols concerning her daily headaches on February 17, 2010.  (Tr. 722-23.)  She stopped using Fioricet but still had daily severe headaches.  (Tr. 722.)  Plaintiff admitted the medications did not help her headaches much.  (*Id.*)  She rated the severity of her headaches on average four out of ten, but getting worse as the day wore on, and sometimes very severe.  (*Id.*)  An MRI of her brain was unremarkable.  (*Id.*)  Plaintiff had been on Vicodin and Percocet on a regular basis for years, but had weaned down to ½ tablet of Vicodin twice a day.  (*Id.*)  Plaintiff's depression had recently increased, and she started Celexa.  (*Id.*)  Plaintiff's physical examination was normal.  (Tr. 723.)  Dr. Abols referred Plaintiff to Dr. Taylor to continue weaning off Midrin, Ultracet and Vicodin.  (*Id.*)  Dr. Abols recommended increase in amitriptyline, and possibly Lamictal, for headache treatment.  (*Id.*)

When Plaintiff saw Dr. Myers on February 26, 2010, Plaintiff expected to be "out on the street" in three to six months.  (Tr. 747.)  She had no prospects for employment.  (*Id.*)  Plaintiff looked tired and had a headache.  (*Id.*)  Dr. Myers assessed a GAF score of 40.  (Tr. 748.)

In therapy on March 2, 2010, Plaintiff reported having severe headaches without her

medications.  (Tr. 635.)  She would be attending a "headache school."  (*Id.*)  Plaintiff was also facing loss of her apartment if she did not get benefits.  (Tr. 634.)  Nevertheless, her depression appeared controlled, and she was functioning on a daily basis.  (*Id.*)  Throughout March, Plaintiff's anxiety increased with her financial problems.  (Tr. 631-33.)

On March 16, 2010, Richard Close completed a Mental Impairment Questionnaire form regarding Plaintiff for her disability hearing.  (Tr. 625-30.)  He treated Plaintiff in psychotherapy for three years in the past, and began treating her again on January 6, 2010.  (Tr. 625.) He diagnosed Plaintiff with major depressive disorder in partial remission;[7] ADHD, predominantly inattentive type; reading disorder;[8] and a current GAF score of 55.  (*Id.*)  Close noted that Plaintiff had some improvement in daily functioning, but her severe depression cycled with periods of moderate functioning, and the possibility of Plaintiff working on a sustained basis was highly unlikely.  (*Id.*)

Close indicated, by checking boxes on the form, that Plaintiff would be unable to meet competitive standards in the following mental activities:  accept instructions and respond appropriately to coworkers; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; deal with normal work stress; and deal with stress of semiskilled and skilled work.  (Tr. 627-28.)  He indicated Plaintiff would be seriously limited but not precluded from maintaining attendance and being punctual within customary, usual strict work tolerances and maintaining socially appropriate behavior.  (*Id.*)  Close opined Plaintiff would have a limited but satisfactory ability to do the following: sustain an

---

[7] DSM-IV Code 296.35 is for major depressive disorder, recurrent, in partial remission. http://doctorcodes.com/dsm-iv/code/296.35

[8] DSM-IV-TR Code 315 is for reading disorder.  DSM-IV-Tr at 53.

ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; responding appropriately to changes in a work setting; and interacting appropriately with the general public. (*Id.*) Finally, Close opined Plaintiff had an unlimited or very good ability to do the following: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for a two-hour segment; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions and request assistance; be aware of normal hazards and take appropriate precautions; understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places, and use public transportation. (*Id.*)

Close offered the following explanations for his opinions: 1) Plaintiff's mental health symptoms seriously limited her consistent attendance; 2) Plaintiff's impulse control was ineffective to accept criticism or work cooperatively with others; 3) normal work stress ended Plaintiff's last several jobs due to impulsivity, verbal aggression, defensiveness, and lack of work/social skills under pressure. (Tr. 627.) He also opined it was probable that Plaintiff would have psychosomatic reactions. (Tr. 628.) Close rated Plaintiff's restriction in activities of daily living as moderate; her difficulties in social functioning were extreme; her difficulties in maintaining concentration, persistence or pace were moderate; and she had one or two episodes of decompensation. (Tr. 629.) Close believed Plaintiff would miss more than four days work per month due to her impairments. (Tr. 630.) Plaintiff would also have difficulty working at a regular job because she had periodic severe depression with

suicidal thoughts and impulses.  (*Id.*)

In March 2010, Plaintiff's stepmother died, and Plaintiff's father had died the last year. (Tr. 743.)  Plaintiff was bereaved and not sleeping well.  (*Id.*)  Dr. Myers assessed a GAF score of 40.  (Tr. 744.)  Also in March, Dr. Myers wrote a letter requesting that Plaintiff's school give her extended time for reading assignments due to her cyclothymic disorder, attention deficit disorder, and dyslexia.  (Tr. 755.)  Dr. Myers also opined that Plaintiff required a quiet setting without distractions for test taking.  (*Id.*)  Plaintiff saw Dr. Myers on April 28, 2010.  (Tr. 739-40.)  A man Plaintiff considered to be like a son was moving in with her while he was on probation.  (Tr. 739.)  Plaintiff's sleep was very disrupted but her mood and social functioning were good.  (*Id.*)  Dr. Myers started Plaintiff on Rozerem for sleep. (Tr. 740.)  She assessed Plaintiff with a GAF score of 40.  (*Id.*)

### 3. Medical Record Submitted to the Appeals Council

Richard Close referred Plaintiff to Dr. Andrew Krueger at Associated Clinic of Psychology for a psychological evaluation, which was performed in August 2010.  (Tr. 757-69.)  Plaintiff's medications at the time included levothyroxine, furosemide, vicodin, citalopram, lansoprazole, topiramate and lamotrigine.  (Tr. 758.)  Plaintiff reported that she received special education services as a child for low comprehension, difficulty with reading and math, and failure to complete assignments.  (*Id.*)[9]  Plaintiff's current problems included difficulty getting out of bed in the morning, difficulty with financial management, and difficulty supporting herself.  (Tr. 759.)

Plaintiff completed the WAIS-IV intelligence test, giving adequate effort and producing

---

[9] In a Disability Report for the SSA, Plaintiff reported she did not attend special education classes.  (Tr. 196.)

apparently valid results. (Tr. 761.) Her full scale IQ score was 104, in the average range.

(Tr. 761-62.) Her nonverbal abilities were significantly lower than her verbal abilities. (Tr.

762.) Plaintiff's personality test scores on the MMPI-2, however, were invalid. (*Id.*) This

could be caused by one or more of the following: poor reading comprehension, random

responding, severe psychosis, severe malingering or guardedness. (*Id.*) Plaintiff's score

on the Beck Depression Inventory (BDI-II), and Patient Health Questionnaire (PHQ-9),

indicated severe symptoms of a depressive disorder. (Tr. 762-63.) Her score on the Beck

Anxiety Inventory (BAI), suggested mild symptoms of an anxiety disorder. (Tr. 764.)

Plaintiff completed other questionnaires regarding her symptoms and behaviors including

the Symptom/Behavior Checklist for Adults (SBCA); Self Rating Behavioral Scale (SRBS),

Global Appraisal of Individual Needs-Short Screener (GAIN-SS), Corners' Adult AD/HD

Rating Scales Self-Report (CAARSSR LV), Wender Adult Questionnaire-Childhood

Characteristics (WAQCC), and Brown Attention-Activation Disorder Scale (BAADS). (Tr.

762-65.)

On mental status examination, Plaintiff appeared depressed and her attention and

concentration appeared mildly impaired, otherwise the examination was normal. (Tr. 766.)

Dr. Krueger made the following diagnoses: major depressive disorder, recurrent and severe

without psychotic features; attention-deficit/hyperactivity disorder, predominantly inattentive

type; and rule out bipolar disorder, NOS. (Tr. 768.) He assessed a GAF score of 50. (*Id.*)

Dr. Krueger recommended continued psychotherapy, consultation with a physician for

medication management and maintaining a healthy lifestyle, and future psychological

evaluations. (Tr. 769.)

### C. **The Administrative Hearing**

At the hearing before the ALJ, Plaintiff testified as follows. (Tr. 35-52.) Plaintiff lived with her mother and a nineteen-year-old friend of the family who just moved in with them. (Tr. 35.) Her last job was as a special needs bus driver. (*Id.*) The job was supposed to be part-time, and Plaintiff was terminated in approximately November 2008, because she could not work full-time due to her therapy sessions. (*Id.*)[10] She collected unemployment. (*Id.*) Plaintiff was now unable to work due to migraines and depression. (Tr. 36-37.) She had a minor headache constantly, and a major headache once a week. (Tr. 37.) Her migraines lasted two hours to three days. (*Id.*) Plaintiff had migraines when she worked in the past, but they were less frequent, and her boss allowed her to leave and make up time later. (Tr. 47, 51.) In 2005, Plaintiff was taking one day off per week for headaches. (Tr. 51.) Presently, Plaintiff treated her migraines with medication and lying down with a wet compress on her head, and recently tried a new treatment with an oxygen mask. (Tr. 38.)

A normal day for Plaintiff was getting out of bed and not doing much. (Tr. 39.) She went to appointments and took one or two online classes at a time. (*Id.*) She was studying holistic medicine through University of Phoenix, an online school. (Tr. 42.) She spent an hour a day on her classes and homework. (Tr. 39.) She tried to do dishes, laundry and pick things up. (Tr. 43.) She was able to drive and go shopping. (*Id.*) Plaintiff only slept, on average, four hours a night. (Tr. 39.)

Plaintiff had difficulty getting along with some people in the workplace. (Tr. 39-40.) It has caused her to lose jobs, especially when she worked as a temporary employee for

---

[10] Plaintiff's termination letter from this employer indicates she was fired for excessive absences, and records indicate she was absent due to bronchitis and having family members in the hospital with severe illness. (Tr. 380-83, 387-88, 410.)

eight years. (Tr. 40.) Plaintiff had friends she talked to on the phone and visited. (Tr. 44.) She was, however, very scared and anxious about meeting new people, sometimes causing a panic attack. (Tr. 44-45.) Plaintiff saw a therapist twice a week to help her function in society, and she was being treated for social anxiety disorder. (Tr. 41, 45.) She also saw a psychiatrist, who diagnosed her with dyslexia, ADHD, and depression, but Plaintiff had ADHD all her life, and was diagnosed with dyslexia when she was 21-years-old. (Tr. 41.) Having ADHD made it difficult for Plaintiff to concentrate, and dyslexia made it difficult for her to read. (*Id.*)

Plaintiff's medications were helpful but they upset her stomach. (Tr. 47.) Alcohol also made Plaintiff feel better. (Tr. *48.*) Plaintiff had fibromyalgia, but it only prevented her from lifting something heavier than a couple cases of pop. (*Id.*) Plaintiff did not have trouble sitting but she could not stand for any length of time because her right leg gave out, and she fell down. (Tr. 49.) Plaintiff had a muscle removed from her right leg when she developed an infection. (*Id.*) Doctors told her to work on strengthening her leg, and it had gotten a little better. (*Id.*)

Mitch Norman, a vocational expert, was the next witness. (Tr. 52.) The ALJ asked Norman a hypothetical vocational question assuming a person with the same age, currently 40-years-old, same education and work history as Plaintiff, who would be limited to lifting twenty pounds occasionally and ten pounds frequently; standing and sitting six hours each in an eight-hour day; occasional climbing, balancing, stooping, crouching and crawling; and simple routine tasks with occasional changes in a routine work setting, missing one day of work per month. (Tr. 53.) Norman testified that such a person could not perform Plaintiff's past work. (*Id.*) However, the person would be capable of performing other jobs, including

counter clerk[11] and mail clerk.[12]  (Tr. 53-54.)

For a second hypothetical question, the ALJ told Norman to assume the same person as in the first hypothetical question, but with the additional limitation of missing three or more days of work per month.  (Tr. 54.)  Norman testified there were no jobs that could be performed on a competitive basis under those circumstances.  (*Id.*)  Additionally, Norman testified that the mail clerk job required occasional contact with others, and the counter clerk job required occasional to frequent contact with others.  (*Id.*)  Furthermore, all light duty jobs would be eliminated if a person could only stand for one hour a day.  (Tr. 55.)  Even sedentary jobs might require up to two hours standing per day.  (*Id.*)

### D.  The ALJ's Decision

On June 29, 2010, the ALJ issued his decision denying Plaintiff's application for disability insurance benefits.  (Tr. 11-29.)  The ALJ followed the five-step sequential evaluation set forth in the agency's regulations.  *See* 20 C.F.R. § 404.1520.  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work;" and (5) if the

---

[11] Dictionary of Occupational Titles ("DOT") number 249.366-010; with 8,400 jobs in Minnesota.

[12] DOT number 209.687-026; with 4,800 jobs in Minnesota.

ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant had not engaged in substantial gainful activity since September 1, 2007, because her work activity in 2008 did not result in substantial gainful earnings. (Tr. 16.) At the second step of the process, the ALJ found that Plaintiff had severe impairments of history of fibromyalgia; chronic leg pain associated with peripheral edema; chronic migraine headaches; cervical pain secondary to a history of degenerative changes; morbid obesity, status-post gastric bypass surgery and complications from surgery; dyslexia; attention-deficit-hyperactive disorder (ADHD); cyclothymic disorder; and adjustment disorder with mixed anxiety and depressed mood. (*Id.*)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 16-17.) Plaintiff had mental impairments under Listings 12.04, organic disorders, and 12.06, affective disorders, but these impairments resulted in only mild restriction in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (Tr. 16.) Therefore, Plaintiff did not establish the "B criteria" of a listed impairment. (*Id.*) Plaintiff's limitations from her mental impairments were only mild because she took classes and did homework daily; did housework, and drove herself to appointments and other places. (*Id.*) The ALJ also found no evidence that Plaintiff met the "C criteria" of Listing 12.04 or 12.06. (Tr. 17.)

30

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform light work not requiring lifting and/or carrying weight of more than 20 pounds occasionally, 10 pounds frequently; no standing or sitting for more than 6 out of 8 hours; no more than occasional climbing of stairs or ladders; no more than occasional balancing, stooping, kneeling, crouching or crawling; and no requirements beyond simple, routine, unskilled tasks with occasional changes in work setting; and which would allow the claimant to miss one day of work per month secondary to migraine. (*Id.*) The ALJ gave the following reasons for his conclusion. Plaintiff was in therapy in September 2006, but by July 6, 2007, she started a new job and her condition improved. (Tr. 18.) She also had a short course of physical therapy for neck pain, with positive results. (Tr. 18-19.) In November 2008, Plaintiff was terminated from a job due to excessive absences and work schedule conflicts. (Tr. 19.) She was found eligible for unemployment benefits and returned to college to study alternative medicine. (*Id.*)

Plaintiff reported extreme mood swings to Dr. Myers in February 2009, but she also reported socializing with family and her godchildren. (*Id.*) Objectively, Plaintiff was alert, oriented, and in no acute distress, her cognition was intact, and her mood was euthymic to dysthymic. (*Id.*) Dr. Myers assessed Plaintiff with a GAF score of 50. (Tr. 20.) In June 2009, her GAF score increased to 60. (Tr. 20.)

There was minimal information in the record about Plaintiff's dyslexia, ADHD, fibromyalgia, leg pain and weakness and peripheral edema, but she testified these conditions significantly limited her ability to work. (Tr. 22-23.) Her treatment for these conditions was limited to intermittent follow-ups, routine medication management, periodic physical therapy, and oral medication. (Tr. 23.) Plaintiff's chronic headaches also improved

31

when she started amitriptyline.  (*Id.*)  Plaintiff's dyslexia and ADHD did not require aggressive treatment or management.  (*Id.*)  The ALJ summarized:

> Overall the evidence does not indicate sustained difficulties with gait or balance, persistent deficits with cognition, concentration and focus, or a total inability to interact socially or to carry out activities of daily living secondary to dyslexia, ADHD, fibromyalgia, leg pain and leg giving out and peripheral edema.

(*Id.*)

The ALJ considered but declined to give significant weight to Richard Close's opinions because they were generally conclusory and not fully substantiated by the objective evidence or clinical findings.  (*Id.*)  Close did not provide detailed explanations for his opinions and did not cite any specific objective or clinical evidence to support his opinions. (*Id.*)  His opinions were inconsistent with the conservative treatment he provided Plaintiff, therapy to deal with life and relationship issues, stressors and mood swings.  (*Id.*)  Close's opinion on how migraines contributed to Plaintiff's inability to work was beyond his field of expertise as a clinical social worker.  (*Id.*)  None of the other physicians or other care providers opined that Plaintiff was completely disabled or that she had any permanent restrictions on activities of daily living or work restrictions.  (Tr. 23-24.)

The ALJ reviewed normal and mild findings by Dr. Niebeling, Dr. Myers, Dr. Seper, and Dr. Abols.  (Tr. 24.)[13]  The ALJ also cited social worker Edelstein's note that Plaintiff had too many providers, and Plaintiff was adept at splitting them, being manipulative, and not dealing straight with everyone.  (*Id.*)  The ALJ also said he gave significant weight to the state agency physicians' opinions because they were consistent with the record as a whole.

---

[13]  The ALJ incorrectly referred to Dr. Abols as "Dr. Abod."

(*Id.*)  But the ALJ did not adopt their opinions, instead, he used them to formulate the RFC, giving Plaintiff some benefit of the doubt regarding ongoing subjective pain and mental limitations.  (*Id.*)

The ALJ also found that Plaintiff's medications were not "totally ineffective and inadequate in controlling her pain and mental symptoms."  (Tr. 25.)  Plaintiff did not require ongoing adjustments to her medications due to ineffectiveness or side effects.  (*Id.*)  She did not require more invasive treatments.  (*Id.*)  Plaintiff relied on her medications greatly, even after she was informed of problems with rebound headaches and risk of dependency.  (*Id.*)  Dr. Abols recommended Plaintiff wean off Fioricet, but Plaintiff testified not taking her medications would make her feel worse.  (*Id.*)  Plaintiff's medications would not preclude work consistent with the RFC.  (*Id.*)

The ALJ found Plaintiff's course of medical treatment to be inconsistent with her subjective complaints.  (*Id.*)  Her treatment was conservative, and she started a job in July 2007.  (*Id.*)  Plaintiff started college courses.  (*Id.*)  Physical therapy was effective.  (*Id.*)  Plaintiff improved with rehabilitation, with maximum medical improvement in October 2009.  (*Id.*)  In January 2010, her right leg weakness improved, and her headaches were improving.  (Tr. 25-26.)

Finally, the ALJ considered Plaintiff's work history, noting she had earnings from 1984 through November 2008, with only three years of insignificant earnings.  (Tr. 26.)  After November 2008, Plaintiff did not look for work at the same or a lesser exertional level.  (*Id.*)  She did not seek help with job retraining or placement.  (*Id.*)  She did, however, go back to school to study alternative medicine.  (*Id.*)  The ALJ concluded Plaintiff was no longer motivated to work.  (*Id.*)

The ALJ reviewed evidence of Plaintiff's treatment and evaluation for mental health impairments.  (Tr. 26-27.)  The ALJ concluded:

> There is no indication that the claimant is unable to take care of herself or her living space, manager her affairs, focus and concentrate on school lessons and homework, and get to places.  There is no evidence that the claimant cannot get along with [her] mother, friends, school and medical staff or providers or participate and engage in small gatherings and social events.

(Tr. 27.)

Based on the VE's testimony, the ALJ concluded Plaintiff was not capable of performing her past relevant work.  (*Id.*)  The ALJ also relied on the VE's testimony in concluding there was other work in the national economy that Plaintiff could perform including mail clerk and counter clerk.  (Tr. 28.)  The ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, from September 1, 2007 through the date of the decision.  (Tr. 29.)

## II.   DISCUSSION

### A.   Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.

1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she can not perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

### B.  Analysis

#### 1.  Medical and Other Opinions

Plaintiff argues the ALJ erred by not accepting the treating providers' opinions and instead relying on the opinions of non-treating, non-examining medical sources.  Plaintiff contends the treatment records support Richard Close's opinion of Plaintiff's functioning. Specifically, Plaintiff cites Dr. Myers' letter requesting accommodation for Plaintiff's reading assignments and test-taking in her online classes due to dyslexia and ADHD, and occasions when Dr. Myers assigned Plaintiff with GAF scores of 40.  Plaintiff concludes that her

severe, frequent, debilitating migraines and mental illness cause her severe difficulties in maintaining functioning, and she would miss three days of work per month, precluding competitive employment.  Plaintiff does not contend her other physical problems are more than a nuisance.  (Plaintiff's Reply Memorandum at 2-3.)

In response, the Commissioner asserts Richard Close was the only provider to give an opinion on Plaintiff's functioning, and there were no other treating source medical opinions of disability for the ALJ to consider.  Additionally, the Commissioner contends the ALJ considered all relevant evidence and found Close's opinion to be extreme, conclusory, and inconsistent with Plaintiff's activities and treatment history.  The Commissioner noted that although Plaintiff had a few GAF scores of 40, her GAF scores frequently varied from 60 to 80.  Although Dr. Krueger tested and diagnosed Plaintiff with mental impairments after the hearing before the ALJ, the Commissioner contends this would not change the ALJ's determination because Dr. Krueger merely recommended ongoing treatment and did not recommend any functional limitations.  As to Plaintiff's physical impairments, the Commissioner asserts the ALJ placed appropriate weight on evidence that Plaintiff was overusing pain medication.

In reply, Plaintiff contends the ALJ violated Social Security Ruling 06-3p by disregarding all of Richard Close's statements because he was a social worker, and not an acceptable medical source.  Plaintiff asserts the diagnoses by Dr. Myer, Dr. Niebeling and Dr. Krueger establish the bases for Plaintiff's medical impairments, and Close's opinion establishes her functional limitations from her impairments.  Plaintiff also asserts the "records, statements and opinions" of Dr. Myer, Dr. Niebeling and Dr. Krueger support Close's opinion.  (Plaintiff's Reply Memorandum, Doc. No. 17, at 4.)

The regulations require the ALJ to consider every medical opinion in the record. 20 C.F.R. § 404.1527(c). Medical opinions are statements from physicians and psychologists and other acceptable medical sources. 20 C.F.R. § 404.1527(a)(2). A licensed social worker is not an "acceptable medical source" under the regulations but falls in the category of "other sources." Social Security Ruling ("SSR") 06-3p, 71 Fed.Reg. 45,593 at *45594 (Aug. 9, 2006); 20 C.F.R. §§ 404.1502 and 1513(d).

> [O]ther sources cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Id.* at *45594. Opinions from medical sources who are not "acceptable medical sources" . . . "should be evaluated on key issues such as impairment severity and functional effects . . ." *Id.*

The only medical opinions from acceptable medical sources in the record are those from the state agency physicians. Although none of Plaintiff's treating physicians offered an opinion on her functional restrictions, the ALJ considered all of the treatment records in the file at the time of the hearing. The ALJ also considered Close's opinion of Plaintiff's functional limitations and gave reasons for not granting Close's opinion significant weight. The ALJ complied with the regulations, the question is whether substantial evidence in the record supports the ALJ's decision.

The first opinion offered by Close, in April 2009, was that Plaintiff's mental health was affected by ongoing migraine headaches. (Tr. 507.) Then, in June 2009, Close opined Plaintiff was ""not able to work at this time in her field." (Tr. 506.) While the record indicates

Plaintiff suffered migraine headaches, particularly when under stress, her headaches were often in remission.  Plaintiff's migraine headaches were noted to be in remission on the following occasions:   October 2007 (Tr. 447, no migraines since quitting job at school district); December 2007 (Tr. 442); April 2008 (Tr. 430.); February 2009 (Tr. 402.); April 29, 2009 (Tr. 519.);  May 2009 (Tr. 517.); June 2009 (Tr. 515.); November 2009 (Tr. 686.); and January 2010 (Tr. 681-82).  Plaintiff only complained of severe ongoing headaches on a few occasions, before she quit her job at the school district (Tr. 446.); under the stress of declaring bankruptcy in March 2008 (Tr. 428); under the stress of unemployment in June 2008 (Tr. 345); and when facing eviction in February and March 2010.  (Tr. 635, 748.)

In January 2010, Dr. Abols noted that Plaintiff was overusing narcotic medications for her headaches and did not want to give up narcotics, even though amitriptyline was the only medication that had improved her headaches.  (Tr. 728-29.)  Because Plaintiff's headaches were frequently in remission except for times of higher stress, and there is evidence Plaintiff misused narcotic medications to treat headaches, the record does not support Plaintiff's allegation of disability from frequent and severe headaches.   See *McGinnis v. Chater*, 74 F.3d 873, 875 (8th Cir. 1996) (claimant not disabled by chronic headaches where claimant could go a month without a headache and daily activities were inconsistent with disabling pain); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) ("A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations") (citing *Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1995)).

In May 2009, Close wrote a letter supporting Plaintiff's disability, stating Plaintiff's depressive symptoms impaired her ability to think and get along with people on a sustained basis.  (Tr. 505.)  Close noted that Plaintiff lost her last two jobs due to her mental health.

38

(*Id.*)  Close's opinion is not supported by substantial evidence in the record.  Plaintiff started looking for a new job because she felt she was not paid enough for her work, and later was unhappy about getting a reprimand.  (Tr. 681-82, 305, 300, 299, 290, 289.)  She quit the school district and worked a temporary job.  (Tr. 446.)  After the temporary job ended, she stayed in bed for a month due to depression and stress.  (Tr. 440.)  However, Plaintiff was much improved by November 2007, and began looking for jobs.  (Tr. 444-45, 446, 442.)  She had some ups and downs due to financial stress and inability to find a job that she wanted over the next year, with her GAF scores ranging from 50 to 80.  (Tr. 418-19, 422, 424-37, 439-40.)

Plaintiff got a job in October 2008, but she was terminated within a month because she missed work and shared inappropriate personal information with a client.  (Tr. 387-90.)  She did not miss work due to depressive or other mental health symptoms, she had bronchitis, and three of her family members were in the hospital with serious illnesses.  (Tr. 380-83, 410.)  Plaintiff was granted unemployment benefits.  (Tr. 390-92.)  Acceptance of unemployment benefits is facially inconsistent with claimed disability because it "entails an assertion of the ability to work," but alone is not conclusive to negate a claim of disability.  *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998); *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) (claimant's lengthy work history offset by facts that the claimant (1) was laid-off from job, rather than forced out due to condition; (2) continued to seek work after alleged disability onset date; and (3) continued to receive unemployment benefits after alleged disability onset).

Plaintiff did not have another severe mood swing until January 2009, when she was hypomanic after not taking her medications for one month.  (Tr. 408–09.)  *See Wagner v.*

*Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (failure to follow a recommended course of treatment weighs against a claimant's credibility). By March 2009, her mood was good and her GAF score was 60. (Tr. 521-22.) Plaintiff had enrolled in an online college, and things were going generally well. (Tr. 519.) Plaintiff had ups and downs in June, July, August and September 2009, related to her financial stress and eviction. (Tr. 556-57, 559-60, 563-64, 566-67, 570-71, 582-86, 735-36.) Her GAF scores fluctuated from 50-70. (*Id.*) In August 2009, social worker Leslie Edelstein noted that Plaintiff's self reporting of severe depression was not congruent with her clinical presentation. (Tr. 580.) At psychological appointments in February 2010, Plaintiff's depression was described as in remission and in partial remission. (Tr. 637, 639).

In a mental impairment questionnaire Close completed in March 2010, he opined that Plaintiff's severe depression cycled with periods of moderate functioning, and the possibility of Plaintiff working on a sustained basis was highly unlikely. (Tr. 625.) The record does not bear this out. Plaintiff had a one month period of severe depression around September or October 2007, and brief occasions of severe depression at times of severe financial stress. Most of the time, her mood was stable and she functioned moderately well, looking for jobs and later taking classes.

Close also opined that Plaintiff had poor impulse control to accept criticism or work cooperatively with others. (Tr. 627.) He stated that normal work stress caused Plaintiff to react with verbal aggression and defensiveness. (*Id.*) However, there is nothing in the treatment records suggesting Plaintiff's difficulty getting along with people was caused by her mental impairments. In one instance, her irritability was linked to her overuse of narcotic pain medications, which she had been on for years. (Tr. 641, 722, 728-29.) Additionally,

Edelstein noted Plaintiff to be manipulative and adept at splitting behaviors with providers, which Edelstein did not attribute to Plaintiff's mental impairments.  (Tr. 553-54.)  Finally, even if Plaintiff's difficulty getting along with people could be attributed to her diagnosed mental impairments, throughout much of the record Plaintiff's GAF scores ranged from 60-80, indicating only mild or intermittent impairments of social, occupational or school functioning.  Plaintiff's lower GAF scores were almost all related to severe financial stress, such as bankruptcy and eviction.  Thus, the record as a whole is inconsistent with Close's opinion that Plaintiff's mental impairments resulted in her inability to get along with others and deal with normal work stress, precluding full-time competitive employment.

Plaintiff also contends that the letter Dr. Myers wrote on her behalf, asking for an accommodation in her college courses for extra reading time and quiet test taking conditions due to dyslexia and ADHD, supports her claim for disability.  Plaintiff had ADHD all her life, and was diagnosed with dyslexia at age 20.  (Tr. 41.)  These conditions did not prevent Plaintiff from working for eight years, 1995-2003, in temporary jobs requiring learning different computer programs; planning, developing and implementing programs; evaluating services; managing personnel; customer service, and supervising a team.  (Tr. 173, 175.)  And, for four years, Plaintiff was a transportation secretary, performing tasks such as operating computer programs, record keeping, filing, organizing, accounting, communicating, and preparing presentations, correspondence, reports and manuscripts, which the vocational expert found to be skilled work.  (Tr. 173, 178, 263.)  Plaintiff clearly was able to compensate for the challenges dyslexia and ADHD posed to her in the workplace.  Even so, the ALJ limited Plaintiff to simple, routine, unskilled tasks with occasional changes in the work setting, work well below the skill level of Plaintiff's past

41

relevant work.  Dr. Myer's letter requesting accommodations for Plaintiff in college does not suggest Plaintiff was incapable of simple, routine, unskilled tasks in a competitive work environment.

Plaintiff's mental impairments often resulted in mild to moderate limitations in her functioning, and only seldom caused greater limitations and additional mental impairment diagnoses in times of increased stress, or on one occasion, when she did not take her medications for one month.  Even Close, who supported Plaintiff's disability claim, opined that she had an unlimited or very good ability to do the following:  remember work-like procedures; understand, remember and carry out very short and simple instructions and detailed instructions; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions and request assistance.  (Tr. 627-28.)  Close also believed Plaintiff would have a limited but satisfactory ability to:  sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; respond appropriately to changes in a work setting; and interact appropriately with the general public. (*Id.*)  The record as a whole supports the ALJ's RFC determination, that Plaintiff could maintain competitive employment in a job limited to light work not requiring lifting and/or carrying weight of more than 20 pounds occasionally, 10 pounds frequently; no standing or sitting for more than 6 out of 8 hours; no more than occasional climbing of stairs or ladders; no more than occasional balancing, stooping, kneeling, crouching or crawling; and no requirements beyond simple, routine, unskilled tasks with occasional changes in work setting; and which would allow the claimant to miss one day of work a month secondary to migraine.

## 2.    Records Submitted to the Appeals Council

After the hearing before the ALJ, Plaintiff submitted records of a psychological evaluation she underwent with Dr. Andrew Krueger in August 2010. (Tr. 4.) The Appeals Council considered the evidence but found it did not provide a basis for changing the ALJ's decision. (Tr. 1-2.) Plaintiff asserts Dr. Krueger's evaluation supports Close's opinion of disability.

When the Appeals Council has considered new material evidence but declined review, the court's task on judicial review "is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ." *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995); *Van Vickle v. Astrue*, 539 F.3d 825, 828 n. 2 (8th Cir. 2008).

Dr. Krueger evaluated Plaintiff by interview and a number of psychological tests, and made diagnoses based on the results. Plaintiff's full scale IQ score was 104, in the average range, with her nonverbal abilities being significantly lower than her verbal abilities. (Tr. 762.) Her personality test results were invalid, possibly due to random responding or severe malingering, which calls into question her effort or her motivation. (*Id.*) Plaintiff's responses on the Beck Depression Inventory (BDI-II), and Patient Health Questionnaire (PHQ-9), indicated severe symptoms of a depressive disorder. (Tr. 762-63.) Numerous tests indicated an attention deficit. (Tr. 762-65.) On mental status examination, Plaintiff's attention and concentration appeared mildly impaired. (Tr. 766.)

In addition to noting Plaintiff's mental health diagnoses per her history, Dr. Krueger diagnosed major depressive disorder, recurrent and severe without psychotic features;

attention-deficit/hyperactivity disorder, predominantly inattentive type; and rule out bipolar disorder, NOS.   (Tr. 768.)   Dr. Krueger assessed a GAF score of 50.   (*Id.*)    He recommended that Plaintiff continue psychotherapy, consult with a physician for medication management and maintaining a healthy lifestyle, and obtain future psychological evaluations.  (Tr. 769.)

Dr. Krueger did not find any specific work-limitations based on his evaluation. Plaintiff's scores on the BDI-II and PHQ-9 suggest Plaintiff was severely depressed at the time of the evaluation.  This, however, is consistent with Plaintiff's occasional episodes of greater stress and depression, often related to financial stress, in this instance, denial of her disability claim by the ALJ.  Moreover, on at least one occasion, Plaintiff's social worker questioned Plaintiff's PHQ-9 score in the severe range of depression because Plaintiff's clinical presentation was incongruent with her reported symptoms.  (Tr. 580.)  In Dr. Krueger's evaluation, Plaintiff's personality test scores were invalid.  And, just several months before Dr. Krueger's evaluation, Plaintiff's mood was euthymic when she saw Dr. Myers at the end of April 2010, and Dr. Myer's diagnosed cyclothymic disorder, not major depressive disorder.  (Tr. 739-40.)  For these reasons, when Dr. Krueger's psychological evaluation of Plaintiff is included in the record as a whole, the ALJ's decision remains supported by substantial evidence in the record.

## III.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 10] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [Docket No. 15] be

**GRANTED;**

3.      If this Report and Recommendation is adopted, that judgment be
entered accordingly.


Dated:   June 13, 2012                     ___s/ Arthur J. Boylan_____
                                           ARTHUR J. BOYLAN
                                           United States Chief Magistrate Judge



Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation
by filing with the Clerk of Court, and by serving upon all parties, written objections which
specifically identify the portions of the Report to which objections are made and the bases
for each objection.  This Report and Recommendation does not constitute an order or
judgment from the District Court and it is therefore not directly appealable to the Circuit
Court of Appeals.  Written objections must be filed with the Court before June 27, 2012.